**Bobby HALL, et al., Plaintiffs-Appellees,**

v.

**BOARD OF SCHOOL COMMISSIONERS OF MOBILE COUNTY, ALABAMA, et al., Defendants-Appellants.**

No. 80–7720.

United States Court of Appeals, Fifth Circuit.*

Unit B

Aug. 2, 1982.

* Former Fifth Circuit case, Section 9(1) of Public     Law 96–452–October 14, 1980.

Sintz, Pike, Campbell & Duke, Frank G. Taylor, Mobile, Ala., for defendants-appellants.

Larry T. Menefee, Mobile, Ala., Michael D. Simpson, Nat. Educ. Assn., Washington, D. C., for plaintiffs-appellees.

Before RONEY, KRAVITCH and ANDERSON, Circuit Judges.

RONEY, Circuit Judge:

This case involves four policies of the defendant school board, two relating to the distribution of literature on school campuses and two relating to visitors on school campuses. The district court, 496 F.Supp. 697, held all four policies facially unconstitutional and also held the two policies concerning literature distribution unconstitutional as applied. Because we share the school officials' basic concern that school administrators must have wide latitude in formulating and administering rules and regulations necessary to promote safety, discipline, order and the appropriate atmosphere for the educational goals of the school, we have studied this case an inordinate length of time since oral argument. Having carefully reviewed the record, the arguments of counsel and the law, however, we hold the district court correctly held the two policies concerning literature distribution to be unconstitutional both facially and as applied. As to the two policies regulating visitors on school campuses, although the question is a close one, we reverse the decision that the policies were facially unconstitutional.

The litigation arose out of a dispute over a teacher competency testing proposal favored by the defendant Board of School Commissioners of Mobile County, Alabama and its members, but strongly opposed by groups of teachers. Certain teachers brought this action on behalf of all present and future teachers employed by the Board and on behalf of a subclass composed of members of the Mobile County Education Association.

The Board of School Commissioners of Mobile County has responsibility for running a school district encompassing 87 local schools, with 87 principals, over 3,000 teachers and 66,000 students. In the course of its administration, the Board adopted four policies intended to regulate the distribution of literature on school campuses and access to the schools by "visitors."

The two policies regulating literature are denoted KIA and KIB and provide:

Policy KIA:

All material political or sectarian in nature distributed on any school campus shall have prior approval of the Assistant Superintendent of Administration.

Policy KIB:

Distribution of special interest materials in the local school shall have prior approval of the Assistant Superintendent of Administration.

The two policies regulating visitors in school campuses are denoted KM and GBRBB and provide in pertinent part:

Policy KM:

All persons not assigned to a school shall report directly to the office when visiting in a school.

The local principal shall within approved systemwide policies develop and disseminate procedures governing individuals visiting in schools.

Final authority in visitation to the local school shall reside within the decision of the principal or responsible designee, keeping in mind the system's obligation is to the safety, welfare, and education of children.

Policy GBRBB:

The school day shall be defined as the time when classes are in session and when faculty and in-service meetings are being held.

\* \* \* \* \* \*

All persons requesting to visit schools to interpret, sell and/or promote products or services must receive a letter of introduction from the assistant superintendent in charge of local school administration (the assistant superintendent may deny the request for a letter of introduction based upon his investigation of the request) to the local school principal who has the prerogative of approving or denying the request to visit the school.

In emergency situations as determined by the teacher, principal and the Division of Personnel, arrangements can be made for a conference with a representative of a teacher organization.

\* \* \* \* \* \*

All professional faculty members are required to be at their stations of duty no later than fifteen (15) minutes before school begins and to leave no earlier than fifteen (15) minutes after the school day ends.

The controversy over application of the above policies grew out of attempts by the MCEA to disseminate documents to teachers, send speakers to school meetings and arrange meetings at the schools.

The district court's findings of fact, which are not contested by the parties, detail the particular incidents involved. Without reviewing them in detail here, it is fair to say the Assistant Superintendent and the principals had widely differing views on what and who should be allowed in the schools with respect to the testing dispute: some Board documents were permitted while some MCEA documents were excluded; in some cases the MCEA sought permission from the Assistant Superintendent and the principals, and in other cases it attempted to distribute leaflets and hold meetings without first seeking permission.

A court's task in balancing the administrators' need for discretion with First Amendment rights of students, teachers and the community is a difficult one. A member of this Court succinctly addressed the problem:

Free expression is itself a vital part of the educational process. But in measuring the appropriateness and reasonableness of school regulations against the constitutional protections of the First and Fourteenth Amendments the courts must give full credence to the role and purposes of the schools and of the tools with which it is expected that they deal with their problems, and careful recognition to the differences between what are reasonable restraints in the classroom and what are reasonable restraints on the street corner.

*Ferrell v. Dallas Independent School District*, 392 F.2d 697, 704–05 (5th Cir.) (Godbold, J., concurring), *cert. denied*, 393 U.S. 856, 89 S.Ct. 98, 21 L.Ed.2d 125 (1968).

### A. *Policies KIA and KIB*

As to policies KIA and KIB, it appears to us the district court has carefully performed its balancing function in analyzing the policies and their administration, capturing both the spirit and intent of the law. We have therefore annexed as an appendix that portion of the district court's opinion dealing with the ultimate disposition of the issues before it.

Without the standards and the guidelines the district court held necessary to make them constitutional, it seems to us the only way to validate the policies as written, would be to assume the Board intended to promulgate valid policies, making the guidelines developed by the courts a part of them. The fact findings of the district court and the defenses asserted in this litigation, however, make clear that neither the Board nor the administrators interpreted the policies within the constraints of such guidelines. Thus the Board cannot find refuge in the language of *Murray v. West Baton Rouge Parish School Board*, 472 F.2d 438 (5th Cir. 1973), which sustained imprecise regulations on the following analysis:

> The statutory proscriptions at issue here are unquestionably imprecise. It is clear, however, that school disciplinary codes cannot be drawn with the same precision as criminal codes and that some degree of discretion must, of necessity, be left to public school officials to determine what forms of misbehavior should be sanctioned. Absent evidence that the broad wording in the statute is, in fact, being used to infringe on First Amendment rights, *cf. Tinker v. Des Moines Ind. Community School Dist.*, 1969, 393 U.S. 503, 89 S.Ct. 733, 21 L.Ed.2d 731, we must assume that school officials are acting responsibly in applying the broad statutory command. *See generally, Karr v. Schmidt*, 5 Cir. 1972, 460 F.2d 609. Despite a vehement attack on the adminis-

tration of the Port Allen High School, plaintiffs have in no way made a factual showing that the statutory discretion accorded to the school officials is being constitutionally abused.

*Id.* at 442 (footnote omitted).

Although the district court found that the literature policies were subject to varying interpretations, the administrators clearly interpreted them to give authority transgressing the First Amendment rights of the teachers under the principles analyzed in *Shanley v. Northeast Independent School District, Bexar County, Texas*, 462 F.2d 960 (5th Cir. 1972). Letters by two Board members on the subject of teacher competency testing were distributed in the schools, while two MCEA papers opposing the Board's position were treated differently. One administrator said he would not have approved the MCEA papers for distribution due to their tendency to incite teachers. One principal refused their distribution in his school solely on the ground they were union material. The problem lies in the fact that there was no difference between the possible disruptive effect of the Board's communications and the MCEA's communications on the subject in controversy. They differ only in the positions taken. School administrators and principals may not permit one side to promote its position while denying the other side the same opportunity.

At oral argument the plaintiffs asserted the decision of the district court is a narrow one. We agree. It involves the rights of teachers to communicate with each other and to be communicated with. It does not involve the rights of students or of persons not assigned to the schools except as related to the rights of the teachers. It does not involve classrooms, students in assembly, or student activities. In summation the plaintiffs' attorney merely argued these policies had been used to interfere with protected communication rights of the teachers and their representatives, stating, "We request that there be developed policies and guidelines that will assure, as best

as is humanly possible, the uniform application of criteria that will allow teachers to communicate with each other and with their association." Except for this controversy between the school administrators and the teachers over competency testing, there is no indication in the record of insensitivity to constitutional requirements in administering these policies. Each case must rise or fall on the evidence, however, and the evidence in this case supports the decision of the district court.

It should be particularly noted that the policies have not been ruled invalid because they require prior submission and prior approval. Rather, this decision turns on the fact that as written they do not furnish sufficient guidance to prohibit the unbridled discretion that is proscribed by the Constitution. There is little doubt that under the guidance of the cases that have developed this law, the Board will be able to devise and implement policies permitting discretion needed to efficaciously operate the Mobile schools, while providing the clarity and procedures required by the First Amendment.

### B. *Policies KM and GBRBB*

■ The district court held these policies were not unconstitutionally vague but were overbroad. The court also found that they lack sufficiently precise standards to guide the school officials' discretion. Although the issue is not without some doubt, we have decided that these policies are not facially unconstitutional for these reasons.

There is a narrow gap between the concept of a policy or statute void for overbreadth and the same policy or statute valid on its face, though it might be unconstitutionally applied. Wright, *The Constitution on the Campus*, 22 *Vand.L.Rev.* 1027, 1067 (1969). *See also Dunn v. Tyler Independent School District*, 460 F.2d 137, 143 n.8 (5th Cir. 1972). These policies applying only to visitors from outside the school environment seeking entry on to the school campus limit the officials' discretion to considerations of the safety, welfare, and education of the children. Although general, these are sufficient standards under the premise that school administrators need broad discretion in supervising school environment when it comes to outside visitors. It is appropriate to construe Policy GBRBB as including the standard of safety, welfare and education of the children included in Policy KM.

The district court found that plaintiffs failed to present sufficient evidence to support a finding that these policies were unconstitutionally applied. That finding is not challenged on appeal. Thus the interpretation of these policies into an unconstitutional mold as it was in the literature policies does not apply here.

### C. *Review Procedure*

■ As the district court noted, the policies do not provide any procedure for prompt review of the school officials' determination. The need for such review procedure only arises when some material is prevented from being distributed or a person refused permission to visit on campus. Prior restraints on the exercise of one's First Amendment freedom of expression require procedures providing prompt review of the decision to restrain. *See Southeastern Promotions, Ltd. v. Conrad*, 420 U.S. 546, 559, 95 S.Ct. 1239, 1246, 43 L.Ed.2d 448 (1975); *Freedman v. Maryland*, 380 U.S. 51, 58–59, 85 S.Ct. 734, 738–39, 13 L.Ed.2d 649 (1965); *Lovell v. City of Griffin*, 303 U.S. 444, 58 S.Ct. 666, 82 L.Ed. 949 (1938); *Shanley*, 462 F.2d at 977–78. We attach here as a second appendix that portion of the district court order, which is affirmed, together with that portion which declines to promulgate rules, which is also affirmed.

### D. *Unclean Hands*

■ On appeal the defendants argued the district court should not have granted equitable relief because plaintiffs came into court with "unclean hands." *See Sullivan v. Houston Independent School District*, 475 F.2d 1071 (5th Cir.), *cert. denied*, 414 U.S. 1032, 94 S.Ct. 461, 38 L.Ed.2d 323 (1973). The point was not asserted in the pleadings, the pretrial proceedings, nor argued as an issue at trial. The district court was never asked to refuse relief on this ground. This

Court has consistently held that it will not consider for the first time on appeal an issue that requires the development of factual issues. *Martinez v. Mathews,* 544 F.2d 1233, 1237 (5th Cir. 1976); *Pierre v. United States,* 525 F.2d 933, 936 (5th Cir. 1976); *Guerra v. Manchester Terminal Corp.,* 498 F.2d 641, 658 n.47 (5th Cir. 1974); *D. H. Overmyer Co. v. Loflin,* 440 F.2d 1213, 1215 (5th Cir.), *cert. denied,* 404 U.S. 851, 92 S.Ct. 87, 30 L.Ed.2d 90 (1971).

The judgment of the district court that Policies KIA and KIB are unconstitutional facially and as applied, and that procedures for review must be provided is affirmed. The district court's determination that Policies KM and GBRBB are facially unconstitutional is reversed. The costs shall be shared equally by the parties.

AFFIRMED IN PART AND REVERSED IN PART.

### APPENDIX I

*Portion of Conclusions of Law from Opinion and Order Dated August 20, 1980 in Civil Action No. 79–0017–P (Southern District of Alabama)*

The court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1343(3) and (4).

Underlying the First Amendment, as well as the Equal Protection Clause of the Fourteenth Amendment where First Amendment rights are concerned, is "a profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open." *New York Times Co. v. Sullivan,* 376 U.S. 254, 270, 84 S.Ct. 710, 721, 11 L.Ed.2d 686, 701 (1964). Teachers, like students, do not become subject to unlimited regulation by the state upon entering the school campus. *See, e.g., Healy v. James,* 408 U.S. 169, 180, 92 S.Ct. 2338, 2345, 33 L.Ed.2d 266, 279 (1972); *Tinker v. Des Moines Indep. School Dist.,* 393 U.S. 503, 506, 89 S.Ct. 733, 736, 21 L.Ed.2d 731, 737 (1969); *Shanley v. Northeast Indep. School Dist.,* 462 F.2d 960, 967 (5th Cir. 1972). School administrators are themselves charged with "a profound na-

tional commitment," the education of young people. A court in delineating the guarantees of the First Amendment on school campuses does not derogate from this important responsibility. It is well established, however, that this responsibility must be exercised within constitutional bounds. *Ingraham v. Wright,* 525 F.2d 909 (5th Cir. 1976), *aff'd,* 430 U.S. 651, 97 S.Ct. 1401, 51 L.Ed.2d 711 (1977); *Boykins v. Fairfield Board of Ed.,* 492 F.2d 697, 702 (5th Cir. 1974), *cert. denied,* 420 U.S. 962, 95 S.Ct. 1350, 43 L.Ed.2d 438 (1975). "[T]he Constitution can be no more loosely interpreted because the motivations behind its infringement may be benign." *Shanley v. Northeast Indep. School Dist.,* 462 F.2d at 976.

The state has a compelling interest in the proper functioning of its school system, *Burnside v. Byars,* 363 F.2d 744 (5th Cir. 1966), and the "special characteristics of the school environment" permit reasonable and narrowly defined limitations upon the exercise of First Amendment freedoms. *Tinker v. Des Moines Indep. School Dist.,* 393 U.S. at 506, 89 S.Ct. at 736, 21 L.Ed.2d at 737; *see Healy v. James,* 408 U.S. 169, 180–81, 92 S.Ct. 2338, 2345–46, 33 L.Ed.2d 266, 279 (1972). The burden of justifying any limitations falls upon the state. *Tinker v. Des Moines Indep. School Dist.,* 393 U.S. at 509, 89 S.Ct. at 737–38, 21 L.Ed.2d at 739; *Shanley v. Northeast Indep. School Dist.,* 462 F.2d at 969.

### I. Policies KIA and KIB

Policies KIA and KIB are vague and overbroad, and have been administered in an unconstitutional manner, in violation of the First and Fourteenth Amendments and 42 U.S.C. § 1983.

The plaintiffs seek to exercise what has been termed "pure speech." *Tinker v. Des Moines Indep. School Dist.,* 393 U.S. at 505, 89 S.Ct. at 735–36, 21 L.Ed.2d at 737; *Cox v. Louisiana,* 379 U.S. 536, 555, 85 S.Ct. 453, 464, 13 L.Ed.2d 471, 484 (1965); *see Lindsey v. Bd. of Regents,* 607 F.2d 672, 674 (5th Cir. 1979). The Board has sought to regulate that speech based upon its content: whether it is "political or sectarian," or

"special interest material." This is not regulation of "time, place, or manner" of expression. *See Police Dep't v. Mosley*, 408 U.S. 92, 99, 92 S.Ct. 2286, 2292, 33 L.Ed.2d 212 (1972).

Content regulations are not per se invalid. In a public forum, the state may restrict expression which is obscene, consists of fighting words, or which poses an imminent danger of grave evil. *See Terminiello v. Chicago*, 337 U.S. 1, 4, 69 S.Ct. 894, 895, 93 L.Ed. 1131, 1134–35 (1949). In the school context, further "reasonable" restraints on expression are permitted, with an increasingly heavier burden as the restraint "focuses on the content of materials that are not obscene, libellous, or inflammatory." *Shanley v. Northeast Indep. School Dist.*, 462 F.2d at 971. " '[C]ontroversy' is, as a matter of constitutional law, never sufficient in and of itself to stifle the views of any citizen . . . ." *Id.*

Policies KIA and KIB contain insufficient standards, purposes, or guidelines by which school authorities may be guided in determining what literature may be distributed on school campuses. They fall far short, therefore, of the requirement that a restraint on expression must be "bounded by clear and precise standards" which are susceptible of objective measurement. *Southeastern Promotions, Ltd. v. Conrad*, 420 U.S. 546, 553, 95 S.Ct. 1239, 1243–44, 43 L.Ed.2d 448, 456 (1975); *see Keyishian v. Board of Regents*, 385 U.S. 589, 603–04, 87 S.Ct. 675, 683–84, 17 L.Ed.2d 629, 641 (1967). Under these policies there exists an unfettered discretion over the exercise of First Amendment freedoms which is unacceptable. *See International Soc'y for Krishna Consciousness v. Eaves*, 601 F.2d 809, 822–23 (5th Cir. 1979); *Shanley v. Northeast Indep. School Dist.*, 462 F.2d at 977.

A law or policy is unconstitutionally vague if people "of common intelligence must necessarily guess at its meaning and differ as to its application." *Connally v. General Constr. Co.*, 269 U.S. 385, 391, 46 S.Ct. 126, 127, 70 L.Ed. 322, 328 (1926); *International Soc'y for Krishna Conscious-*ness *v. Eaves*, 601 F.2d at 830. Although it is true that a school regulation need not be drawn with the precision of a criminal code, at least where no penalty is involved, *Jenkins v. Louisiana St. Bd. of Education*, 506 F.2d 992 (5th Cir. 1975), measures affecting First Amendment rights require a greater degree of specificity because of the fundamental rights involved. *E.g., Smith v. Goguen*, 415 U.S. 566, 573, 94 S.Ct. 1242, 1247, 39 L.Ed.2d 605 (1974).

Here we have college trained educators straying all over the field by their various interpretations of the written policies.

The evidence demonstrates that people of common intelligence not only must but in fact have disagreed as to the meaning and application of the words of the policies, "political or sectarian," and "special interest." No indication of the meaning of "distribution" is to be found in the policies. *See Baughman v. Freienmuth*, 478 F.2d 1345, 1349 (4th Cir. 1973); *Eisner v. Stamford Bd. of Ed.*, 440 F.2d 803, 811 (2d Cir. 1971). The supposed ill to be prevented by the policies, "disruption," is neither stated as a standard for decision nor defined. *See Nitzberg v. Parks*, 525 F.2d 378, 383 (4th Cir. 1975); *Shanley v. Northeast Indep. School Dist.*, 462 F.2d at 976.

Policies KIA and KIB are also overbroad, because they may be applied to, and thus deter protected expression. *See Grayned v. Rockford*, 408 U.S. 104, 114, 92 S.Ct. 2294, 2302, 33 L.Ed.2d 222, 231 (1972). Under *Shanley*, expression may be prohibited only

"if it materially and substantially interferes with school activities or with the rights of other students or teachers, or if the school administration can demonstrate reasonable cause to believe that the expression would engender such material and substantial interference."

462 F.2d at 970. Policies KIA and KIB reach all political, sectarian or special interest materials, whether it has or may have such an effect, or not. The policies have been implemented by an unequal application depending on the person or organization applying.

Prior submission rules are permissible. This aspect of the policies does not offend the First Amendment. *Sullivan v. Houston Indep. School Dist.*, 475 F.2d 1071, 1076 (5th Cir. 1973); *Pervis v. LaMarque Indep. School Dist.*, 466 F.2d 1054 (5th Cir. 1972). A prior submission rule may not, however, operate to stifle in an unconstitutional manner the contents of the materials submitted. *Shanley v. Northeast Indep. School Dist.*, 462 F.2d at 969.

Policies KIA and KIB violate the First and Fourteenth Amendments and 42 U.S.C. § 1983 as they are applied, because they are administered in an arbitrary and inconsistent manner, and have been administered with the effect, if not the intent, of curtailing expression by members of the MCEA.

Although substantial interference with the educational process is a basis for restricting the exercise of First Amendment freedoms, disagreement with the philosophy being expressed is emphatically not. *See Healy v. James*, 408 U.S. at 187–89, 92 S.Ct. at 2349–50, 33 L.Ed.2d at 283–84; *Near v. Minnesota ex rel. Olson*, 283 U.S. 697, 51 S.Ct. 625, 75 L.Ed. 1357 (1931); *Shanley v. Northeast Indep. School Dist.*, 462 F.2d at 971. The differing treatment by Dr. White and Principal Michaels of Plaintiffs' Exhibits 5, 7, 8, and 10 demonstrates that precisely this type of restriction occurs under the policies. This court can discern, and the Board has shown, no difference between the disruptive effect, actual or potential, of the Board's communications and some of MCEA's communications on the same subject. They differed only in the positions taken. Apart from whether the Board should be able to communicate its opinion on an issue on "its own" property, the differing treatment is not supported by any state interest, and demonstrates that some of the MCEA material has been unconstitutionally restricted based upon its content.

The commission of discretion to the various principals to admit or exclude materials from their campuses, without explicit guidelines, has resulted in administration of the policies which is both arbitrary and inconsistent. The policies do not limit a principal's discretion to the standards set forth in *Shanley* and other cases, but leave him with unlimited discretion. This discretion has been exercised solely on the basis of whether a principal agreed or disagreed with the statements made. This violates the First Amendment and 42 U.S.C. § 1983, as discussed above. The inconsistencies in administration found from school to school violate the Equal Protection Clause of the Fourteenth Amendment and 42 U.S.C. § 1983. *See Police Dep't v. Mosley*, 408 U.S. 92, 92 S.Ct. 2286, 33 L.Ed.2d 212 (1972).

There is no evidence that the presence of some of the MCEA materials on the school campuses has caused "material and substantial disruption" of the educational process. There is evidence, however, that some materials concerning teacher competency testing have found their way into class rooms, where the subject was discussed notwithstanding that it was unrelated to the subject matter of the course. The wearing of "No" buttons and unrestricted distribution of MCEA flyers invited student attention to a teacher's interested position. The Board clearly may ensure that classrooms are used for teaching the prescribed curriculum, and not as a means of disseminating the MCEA's position on issues concerning their employment. *Pred v. Board of Public Instr.*, 415 F.2d 851 (5th Cir. 1969); *see Clark v. Holmes*, 474 F.2d 928, 931 (7th Cir. 1972), *cert. denied*, 411 U.S. 972, 93 S.Ct. 2148, 36 L.Ed.2d 695 (1973); *Mailloux v. Kiley*, 448 F.2d 1242 (1st Cir. 1971); *Nigosian v. Weiss*, 343 F.Supp. 757 (E.D.Mich. 1971); *cf. Buckel v. Prentice*, 410 F.Supp. 1243, 1247 (S.D.Ohio 1976), *aff'd*, 572 F.2d 141 (6th Cir. 1978) (use of students as messengers). *But cf. Kingsville Indep. School Dist. v. Cooper*, 611 F.2d 1109, 1113 (5th Cir. 1980) (certain classroom activity is protected speech). Protection of the curriculum is a legitimate state interest; it may be accomplished, however, by means less intrusive on First Amendment rights than are policies KIA and KIB. Without such a "narrow tailoring" the policy is unconstitutional. *Police Dep't v. Mosley*, 408 U.S. at 101–02, 92 S.Ct. at 2293–94, 33 L.Ed.2d at 220.

APPENDIX II

### III. Adequacy of Appellate Review

Policies restricting the exercise of First Amendment rights must contain a mechanism for appellate review which provides for "a brief and reasonable time" for decision and review; the court in *Shanley* noted that:

> "The occasions calling for the exercise of free speech are fleeting, and lack of clarity or a delay in implementation of screening regulations carry [*sic*] the inherent danger that the exercise of speech might be chilled altogether during the period of its importance."

462 F.2d at 977. The failure of the policies to provide for such an appellate mechanism is a violation of due process. *Id.* at 977–78; *see Baughman v. Freienmuth*, 478 F.2d 1345 (4th Cir. 1973); *Eisner v. Stamford Board of Ed.*, 440 F.2d 803, 810 (2d Cir. 1971).

Such review should be provided for promptly and acted on promptly.

### IV. Promulgation of Other Regulations

The plaintiffs have requested that the court order the defendants to promulgate constitutional policies for the distribution of literature on and visitors to school campuses. Alabama law does not require the Board to promulgate policies in pursuit of its statutory obligations. *See* Alabama Code §§ 16–10–1 to 16–10–11 (1975). Further, the court "should not lightly interfere with the day-to-day operation of schools." *E.g., Augustus v. School Board*, 507 F.2d 152, 155 (5th Cir. 1975); *Wright v. Houston Indep. School Dist.*, 486 F.2d 137 (5th Cir. 1973), *cert. denied*, 417 U.S. 969, 94 S.Ct. 3173, 41 L.Ed.2d 1140 (1974). The court is hopeful that the Board, in a redrafting of its policies, will do so in good faith and in conformity with the instructive body of constitutional law which has developed in this area.